UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARVIN LEMIEUX,
    Plaintiff,                                                    Case No. 17-12339

v.

EXXON MOBIL CORPORATION,                HON. AVERN COHN
    Defendants.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This is an employment discrimination case. Plaintiff, Marvin Lemieux ("Lemieux"), is suing Exxon Mobil Corp. ("Exxon") for race and age discrimination. Lemieux is a 70-year-old, African American. He says Exxon discriminated against him based on his race in violation of Title VII of the Civil Rights Act of 1964 and 1991, 42 U.S.C. § 2000 et seq., 42 U.S.C. § 1981, and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 et seq. (Doc. 1). Lemieux also says Exxon discriminated against him based on his age in violation of the Age Discrimination Act ("ADEA"), 29 U.S.C. §§ 621–634, and Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 et seq. Id. Lemieux's complaint is in four counts:

- Count 1: Race discrimination under Title VII,
- Count 2: Race discrimination under 42 U.S.C. § 1981,
- Count 3: Age discrimination under ADEA,
- Count 4: Age and race discrimination under the ELCRA.

Id. Lemieux seeks retroactive and prospective damages as well as attorney fees. Discovery has concluded and now before the Court is Exxon's Motion for Summary Judgment. (Doc. 14). For the following reasons, the motion is GRANTED.

## II.  BACKGROUND

### *A. Lemieux's Employment History*

Lemieux was first hired by Exxon on February 3, 1992.  Initially, he began working for Advanced Elastomers Systems, LLC, which was a joint venture by Exxon and Monsanto that was later wholly acquired by Exxon. (Doc. 24, p. 2).  Lemieux was later assigned the job title of "Sales Answer Person" in 2008. Id. at 3.  This position was created to assist Exxon's "Santoprene" product, which is a "rubber plastic material product line." Id. at 2-3.  Lemieux's role as the Sales Answer Person included answering customer questions about the product. Id. at 3.

Lemieux's position was eventually reorganized into Exxon's sales and marketing division. Id. at 3-5.  In 2008, Lemieux became the Sales Answer Person for the "Americas" sales region.  He was assigned to the Farmington Hills office in Michigan and remained in Michigan until the date of his "termination."[1] Id. at 5-6.  Although he worked in a sales and marketing division within Exxon, Lemieux was a chemist with no background in sales. Id. at 5.

At some point between 2009 and 2012,[2] Exxon's office in Farmington Hills closed. Id. at 8.  After the office closed, all sales employees, including Lemieux, became "home-based." Id.  Lemieux worked from his home in Michigan until the end of his employment with Exxon. Id.

During 2015, the Sales Answer Person for the Europe, Middle East and Africa regions, Mario Schwartz ("Schwartz"), took medical leave for approximately six months.

---

[1] There is a dispute between the parties as to whether Lemieux's leaving the company should be classified as a retirement or a termination.
[2] Parties dispute the year that the Farmington Hills office closed. However, this fact is immaterial to the case.

Id. at 7. During Schwartz's medical leave, Lemieux performed all of Schwartz's duties, as well as his own, on a full-time basis. Id. Lemieux was able to assist with Schwartz's sales region "without any difficulty." Id.

### B. Exxon's Corporate Restructurings

As stated above, Exxon and Monsanto were engaged in a joint venture regarding the product Santoprene, which was owned by Advanced Elastomers Systems, LLC ("AES"). (Doc. 24, p. 2-3). Exxon later became the sole owner of AES. Id. When Exxon acquired AES, Lemieux became an employee of Exxon—with a retroactive hire date of February 3, 1992. Id. at 3. Exxon created the Sales Answer Person position to provide its customers with technical support regarding Santoprene. Id. Santoprene had a website in which customers could ascertain Lemieux's contact information. Id.

In 2008, Exxon reorganized its technology division. Id. at 4. As a result of the reorganization, the Sales Answer Person position was moved from Exxon's technology division to its sales and marketing division. Id. The sales marketing division belonged to one of Exxon's businesses: Specialty Elastomers & Butyl ("SEB"). Id. SEB sells three products, including Santoprene. Id. SEB has three sales regions: (1) Americas, (2) Asia, and (3) Europe, Middle East, and Africa. Id. SEB does not have a technology department; its business functions are limited to sales, marketing and planning. Id. at 5.

In SEB, the Sales Answer Person was a unique position because the position was a technical role and no other employee within SEB performed any of the job functions of the Sales Answer Person. Id. at 6. In 2008, when the position was first transferred to SEB, there were only two Sales Answer Persons for the "Americas" sales region. Id. Outside the "Americas" sales region, there were two other Sales Answer

3

Person positions. Id. at 7.  One Sales Answer Person outside the "Americas" region was Mario Schwartz, who was in charge of the "Europe, Middle East, and Africa" region, and the other was Julie Li Zhu, who was in charge of the "Asia" sales region. Id.

In 2009, Exxon discontinued the Santoprene website as the result of decisions made during the merger of AES and Global Energy Management Systems. Id.  This had an impact on Exxon's customers being able to contact Lemieux directly, and changed the call procedures by routing or filtering calls through SEB's Bangkok office. Id. at 8. Additionally, around this time, Exxon reorganized its business model and moved its smaller customers to outside distribution companies, such as Nexeo Solutions. Id. at 9. Exxon says that these smaller customers needed more assistance and accounted for a large number of questions that came to Lemieux. Id. at 9-10.  Shortly after, the other Sales Answer Person in the "Americas" region left his position at Exxon and was not replaced. This left Lemieux as the only Sales Answer Person in charge of the "Americas" region. Id. at 10.  Exxon decided that a second Sales Answer Person in the "Americas" region was not necessary because there was not enough work for two Sales Answer Persons. Id.

By 2012, Exxon had made the decision to close its Farmington Hills office were Lemieux worked. Id. at 8.  As a result, all sales employees—including Lemieux—were permitted to work from home. Id.  When the Farmington Hills office was closed, five employees in Exxon's technology division were also permitted to work from home. Id. However, all the other technology employees at the Farmington Hills office were relocated to Baytown, Texas. Id.

Exxon says that at some point it reevaluated its business philosophy on home-based offices. Id. at 11. Since 2014, Exxon's technology organization has not created any home-based positions. Id. However, Exxon admits that an exception was made regarding three technology employees in Akron, Ohio, after it closed its office there in 2015. Id. at 12. Since the Akron exception, no other exceptions have been made regarding home-based offices. Id. at 14.

In 2015, Exxon considered eliminating Lemieux's position because Exxon's management no longer considered the position to be full-time. Id. Ultimately, Exxon says it decided to eliminate the Sales Answer Person position worldwide. Id. at 16.

*C. Lemieux's Termination*

In 2015, Lemieux's Regional Sales Manager, George Panagopoulos ("Panagopoulos"), made a recommendation to Exxon's Global Sales Manager, Jean Marc Taton ("Taton"), to eliminate Lemieux's position because he no longer considered it to be a full-time job. (Doc. 24, p. 4, 14). In response to Panagopoulos' recommendation, Taton asked all the Regional Sales Managers to evaluate the Sales Answer Person position in their respective regions and determine whether all the positions should be eliminated for the same reasons (i.e. that the position was no longer a full-time job). Id. at 16. Ultimately, the three Regional Sales Managers agreed on eliminating the position within their region. Id.

After Panagopoulos and Taton had made the decision to eliminate Lemieux's position, Panagopoulos contacted SEB's human resource department. Id. Panagopoulos' contact at SEB's human resource department was Mark Fuselier ("Fuselier"). Panagopoulos gave Fuselier the reasons for why Exxon should eliminate

5

the Sales Answer Person position, stating that the job responsibilities had shrunk over the years. Id. Fuselier requested a detailed history of the job to evidence the need to eliminate the position. Id.

In order to prepare the job history report to Fuselier, Panagopoulos began speaking with Tim Canton ("Canton"), who was the Area Sales Manager to the "Americas" region and, essentially, the supervisor of Lemieux. Id. at 17-18. During his communications to Canton, Panagopoulos instructed Canton to tell Lemieux that: (1) the Sales Answer Person position was being eliminated, (2) that Exxon did not believe he was qualified (or a good "fit") for a sales position, and (3) to ask Lemieux if he would like Exxon to search for a position for him in Baytown, Texas. Id. at 18.

After speaking with Canton, Panagopoulos sent Fuselier an email regarding the history of the Sales Answer Person position, which stated:

- In 2009 the Santoprene website was abandoned when AES was merged in GEMS. This loss of functionality reduced customer access to the answerperson
- In 2010 80-90% of Santoprene customers were transitioned to distribution as they were small customers and represented 5-10% of volume
- After the transition, we went from two Answerpersons to one
- Majority of Santoprene growth since 2011 has been in large volume applications with a smaller number of customers. The larger customers are more self-sufficient and the activity is focused on one market segment: auto weatherseals
- Over time we trained the distributors to become more self-sufficient reducing the activity to less that 1 FTE

Id. at 19; (Doc. 14, Ex. 2). Fuselier then sent "talking points" to Panagopoulos regarding the elimination of Lemieux's position. (Doc. 24, p.19). Panagopoulos communicated these points to Lemieux. Id. Among these talking points was the fact that Lemieux would have to move to Baytown to get a job in Exxon's technology division. Id.

Lemieux told Exxon that he was interested in job opportunities in Baytown. Id. at 24. In his discussions with Canton, the subject of retirement was mentioned, and the subject of Exxon's retirement seminars was mentioned. Id. 23-25. Exxon conducted a search to find Lemieux another position within the company. Id. at 23-24. At some point during the job search to relocate Lemieux, Canton was told by another employee ("Marvin"—who is an individual outside the management chain) that Lemieux was no longer willing to move to Baytown. Id. at 27. Accordingly, Exxon discontinued the job search and Lemieux retired. Id. Lemieux says that he was forced into retirement because his position was being eliminated. Id.

### D. Other Exxon Sales Answer Person Employees

Julie Li Zhu ("Zhu") was the Sales Answer Person for the Asia sales region. (Doc. 24, p. 29). Her position was eliminated and she was placed in the position of Sales Assistant. Id.

Mario Schwartz is the Sales Answer Person for the "Europe, Middle East, and Africa" region. Id. at 30. Although Exxon says "[t]here are plans to eliminate [Schwartz's] Sales Answer Person position," he still holds the title of Sales Answer Person. Id. However, Exxon says that his position has been expanded to include additional job duties. Id.

Both Schwartz and Zhu are younger than Lemieux, and are not African American. Id. at 32. Global Sales Manager, Taton, is the only decision-maker that links Lemieux with Zhu and Schwartz. Id.

## III. LEGAL STANDARD

### *A. Summary Judgment*

A motion for summary judgment will be granted if the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986)). In doing so, the Court "must view the evidence in the light most favorable to the non-moving party." Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc., 69 F.3d 98, 101–02 (6th Cir. 1995). In employment discrimination cases subject to the *McDonnell Douglas* framework, a defendant's evidence can be considered as to whether the defendant has established a non-discriminatory reason for termination. Almond v. ABB Industrial Systems, Inc., 56 Fed. Appx. 672, 675 (6th Cir. 2003).

### *B. Age Discrimination*

Michigan's "ELCRA claims are analyzed under the same standards as federal ADEA claims." Till, 805 F.Supp.2d at 368 (citing Greiger v. Tower Automotive, 579 F.3d 614, 626 (6th Cir. 2009)). "Thus, Plaintiff's claims under the ADEA and Michigan's ELCRA will be analyzed together." Id. A plaintiff can prove age discrimination by "either direct or circumstantial evidence." Greiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009). A plaintiff seeking to prove a case of employment discrimination through the use

8

of circumstantial evidence must do so under the McDonnell Douglas framework. See Young v. United Parcel Services, Inc., 135 S.Ct. 1338, 1353 (2015); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "The framework requires a plaintiff to make out a *prima facie* case of discrimination. But it is 'not intended to be an inflexible rule.'" Id. (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 575 (1978)). "The burden of making this showing is 'not onerous.'" Id. at 1354. (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)). A plaintiff is not required to show that "those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways." Id. (citing McDonnell Douglas, 411 U.S. at 809)).

To establish a *prima facie* case of age discrimination, a plaintiff must show: "(1) membership in a protected group;[3] (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 510 (2002).

"Once the plaintiff succeeds in making out a *prima facie* case of age discrimination, the defendant must 'articulate some legitimate, nondiscriminatory reason' for the termination." Blizzard, 698 F.3d at 283 (quoting Griger, 579 F.3d at 802). "If the defendant meets this burden, then the burden of proof shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 615 (6th Cir. 2003).

To prove pretext, Plaintiff must show that (1) the proffered reason for termination had no basis in fact, (2) the proffered reason did not actually motivate the decision to

---

[3] The law recognized age discrimination protections for persons of at least 40 years old. Till v. Spectrum Juvenile Justice Services, 805 F.Supp.2d 354 (E.D. Mich., 2011); Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 317 (6th Cir. 2007).

9

discharge, or (3) the proffered reason was insufficient to motivate a discharge. Id.; Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir. 2012). This three-part test is not applied rigidly. Id. When evaluating pretext at the summary judgment phase, "the court should consider all evidence in the light most favorable to the plaintiff, including the evidence presented in the *prima facie* stage." Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 812 (6th Cir. 2011).

### *C. Race Discrimination*

In the Sixth Circuit, a court "review[s] claims of discrimination brought under the ELCRA and § 1981 under the same standard as claims brought under Title VII." Idemudia v. J.P. Morgan Chase, 434 Fed.Appx. 495, 499 (6th Cir. 2011). Thus, under both claims, a plaintiff must advance a *prima facie* case of race discrimination by demonstrating "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." Id. (quoting White v. Baxter Healthcare Corp., 533 F.3d 381 (6th Cir. 2008)).

Similar to age discrimination, circumstantial evidence of race discrimination is subject to the McDonnell Douglas framework. Thus, once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason' for the termination." Blizzard, 698 F.3d at 283 (quoting Griger, 579 F.3d at 802). "If the defendant meets this burden, then the burden of proof shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." Sutherland, 344 F.3d at 615.

A pretext analysis in the race discrimination context is similar to the pretext analysis in an age discrimination case. A plaintiff must demonstrate that a jury could find a defendants' proffered reasons for termination "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." Idemudia, 434 Fed.Appx. at 503.

### IV. DISCUSSION

Here, Lemieux has failed to show that a reasonable jury could find that he was terminated because of his race or age. Lemieux has, at best, established a weak *prima facie* case of discrimination, but has failed to prove that Exxon's proffered reasons for termination were pretext.

Even assuming Lemieux has satisfied his *prima facie* burden,[4] summary judgment is appropriate because he has failed to establish that Exxon's proffered reason for termination is pretext. To prove pretext, the evidence must permit a reasonable juror to find that: (1) Exxon's proffered reason for termination had no basis in fact, (2) the proffered reason did not actually motivate Exxon's decision to discharge, or (3) the proffered reason was insufficient to motivate a discharge.

First, Exxon's proffered reason for termination is supported by the facts. The evidence shows that the Sales Answer Person position had been altered in a way that led Exxon's management to conclude the position should be terminated. (Doc. 24,

---

[4] The Court will assume, without deciding, that Lemieux has established a *prima facie* case. The Court questions whether Lemieux is "similarly situated" to other Sales Answer Persons within Exxon. However, the parties have not produced enough evidence surrounding the employment circumstances of Lemieux's comparables for the Court to make an informed decision. Because Lemieux is entitled to favorable inferences at this stage of the case, the Court will settle the uncertainty in favor of Lemieux by making an assumption that supports his position.

p.19); (Doc. 14, Ex. 2). Although Lemieux disputes some of Exxon's job characterizations, Exxon is protected by the "modified honest belief" rule, which shields employers from liability for factual mistakes that were reasonably relied upon when making the decision to terminate. Excher v. BMXT-12, LLC, 627 F.3d 1020, 1030 (6th Cir. 2010). Thus, the factual basis for Exxon's proffered reason for termination weighs against a finding of pretext.

Second, there is no evidence that Exxon's proffered reason did not actually motivate its decision to terminate the Sales Answer Person position. Lemieux has not pointed to any managerial actions that would suggest an alternative reason for termination. There is no evidence of any disparaging remarks or conduct that would suggest a discriminatory reason for termination. Although Lemieux contends that the repeated mention of "retirement" during his termination suggests age discrimination, he "has offered no evidence that [Exxon] use[d] 'retire' as a proxy for 'too old' or some other derogatory, age-based term." Scott v. Potter, 182 Fed.Appx. 521, 526 (6th Cir. 2006) (opining that the word "retire" does not necessarily connote age and holding that the statement "[w]hy don't you retire and make everybody happy" did not alone constitute evidence of discrimination).

Lastly, Lemieux has not shown that Exxon's legitimate business reason for his termination was insufficient to motivate his discharge. The evidence shows that Exxon's management believed the position should be eliminated for purposes of business efficiency and cost. (Doc. 24, p.19); (Doc. 14, Ex. 2). By Lemieux's own admission, he was able to handle all the responsibilities of another Sales Answer Person, as well as his own, "without any difficulty." (Doc. 24, p. 7). Thus, Exxon's

legitimate business reasons were sufficient to warrant terminating the Sales Answer Person position in America. See, Lefevers v. GAF Fiberglass Corp., 667 F.3d 721, 726 (6th Cir. 2012).

Lemieux argues that because other Sales Answer Persons, Zhu and Schwartz, were treated differently, he has shown pretext. The Court disagrees. The only common decision-maker in this case was Taton. (Doc. 25, ¶17-¶24) (Doc. 26, ¶24). After Taton made the decision to eliminate the position globally, he had no part in the subsequent decisions regarding the Sales Answer Person positions. (Doc. 25, ¶24) (Doc. 26, ¶24). Thus, the fact that Zhu and Schwarts were treated favorably by different managers, in different regional management structures, is not evidence that Taton discriminated against Lemieux. Because the favorable treatment of other Sales Answer Persons within the company cannot be attributed to Taton as the decision-maker, it is not evidence of pretext or discrimination.

## V. CONCLUSION

Therefore, summary judgment is appropriate because all factors for establishing pretext weigh in favor of Exxon and Lemieux has offered no evidence to rebut Exxon's legitimate business reasons for termination. Exxon's Motion for Summary Judgment (Doc. 14) is GRANTED.

SO ORDERED

                                                s/Avern Cohn
                                                AVERN COHN
                                                UNITED STATES DISTRICT JUDGE

Dated: 1/24/2019
Detroit, Michigan